[Cite as *State v. Armour*, 2022-Ohio-2717.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## ALLEN COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,             CASE NO. 1-22-05

    v.

KASCAL D. ARMOUR,                 O P I N I O N

    DEFENDANT-APPELLANT.

---

STATE OF OHIO,

    PLAINTIFF-APPELLEE,             CASE NO. 1-22-06

    v.

KASCAL D. ARMOUR,                 O P I N I O N

    DEFENDANT-APPELLANT.

---

**Appeals from Allen County Common Pleas Court**
**Trial Court Nos. CR 2020 0193 and CR 2020 0412**

**Judgments Affirmed**

**Date of Decision: August 8, 2022**

---

APPEARANCES:

    *Chima R. Ekah* **for Appellant**

    *Jana E. Emerick* **for Appellee**

**SHAW, J.**

{¶1} Defendant-appellant, Kascal D. Armour ("Armour"), brings these appeals from the January 21, 2022 judgments of the Allen County Common Pleas Court journalizing his convictions in two separate trial court cases. Armour was convicted by a jury in trial court case CR2020 0193 of aggravated trafficking in drugs, possession of a fentanyl-related compound, and having weapons while under disability. Armour was convicted by the same jury in trial court case CR2020 0412 of trafficking in heroin and possession of cocaine. On appeal, Armour argues that inadmissible, prejudicial hearsay was introduced against him at trial, that the prosecutor improperly referred to the inadmissible hearsay during closing arguments, and that his convictions were against the manifest weight of the evidence.

*Background*

{¶2} A confidential informant conducted controlled drug buys at 543 East Second Street in Lima on July 13, 20, and 22 of 2020. The drug purchases were purportedly made from Stanford Shine and Ryanne Eversole. A search warrant was obtained for 543 East Second Street and it was executed just after 7 a.m. on July 24, 2020.

{¶3} Numerous adults and children were in the residence at the time the warrant was executed. Shine and Eversole were located on the first floor of the

residence in or near a room where they stayed. Various drugs in smaller amounts, approximately 2 grams or less, were located in Shine and Eversole's room.

{¶4} Armour and his paramour/the mother of his children, Lexus Becker, were located on the home's second floor "landing" just outside of the east bedroom. In the second floor, east bedroom, officers located multiple drugs in much greater amounts than were found downstairs. The drugs found included a fentanyl-related compound, cocaine, heroin, and over 200 grams of methamphetamine. Moreover, in that same upstairs bedroom, officers located over $9,000 in cash. Mixed in with the cash was currency that had been used in the controlled drug buys. Officers also located a loaded, operable firearm on the bed in the room.

{¶5} In a police interrogation shortly after the warrant was executed, Armour acknowledged staying in the second floor, east bedroom, the previous night. He also claimed that the cash belonged to himself and to Becker, stating that she had received the money from the government stimulus. Further, Armour acknowledged being a fentanyl user; however, he claimed that he did not know anything about the drugs that were found in the room where he was staying, even though a bag containing a fentanyl-related compound was in plain view on the floor and there was cocaine in the same bag with the cash he stated was his or Becker's.

{¶6} On September 17, 2020, Armour was indicted in trial court case CR2020 0193 for: Count 1, aggravated trafficking in drugs (methamphetamine) in

violation of R.C. 2925.03(A)(2), a first degree felony, Count 2, aggravated possession of drugs (methamphetamine) in violation of R.C. 2925.11(A), a first degree felony, Count 3, trafficking in a fentanyl-related compound in violation of R.C. 2925.03(A)(2), a third degree felony, Count 4, possession of a fentanyl-related compound in violation of R.C. 2925.11(A), a third degree felony, Count 5, having weapons while under disability in violation of R.C. 2923.13(A)(2), a third degree felony, and Count 6, having weapons while under disability in violation of R.C. 2923.13(A)(3), a third degree felony.[1] The first 4 counts all contained 1-year firearm specifications, gun forfeiture specifications in a drug case, and money forfeiture specifications in a drug case.

{¶7} On November 12, 2020, Armour was indicted in trial court case CR2020 0412 for: Count 1, trafficking in heroin in violation of R.C. 2925.03(A)(2), a second degree felony, Count 2, possession of heroin in violation of R.C. 2925.11(A), a second degree felony, and Count 3, possession of cocaine in violation of R.C. 2925.11(A), a fifth degree felony.[2] Counts 1 and 2 carried 1-year firearm specifications, gun forfeiture specifications in a drug case, and money forfeiture specifications in a drug case.

---

[1] Counts 3 and 4 were originally indicted as first degree felonies; however, they were later amended to accurately reflect the amount of drugs recovered, making the crimes third degree felonies.
[2] The second indictment stemmed from the same incident as the first indictment.

{¶8}    The two cases against Armour were consolidated and they proceeded to a jury trial on January 18-20, 2022. Ultimately the jury convicted Armour of all counts against him in both indictments except for Count 3 in trial court case CR2020 0193 (trafficking in a fentanyl-related compound).

{¶9}    The cases proceeded immediately to sentencing with the trial court determining that Counts 1 and 2 in trial court case CR2020 0193 merged for purposes of sentencing and Counts 5 and 6 merged for the purposes of sentencing.[3] The State elected to proceed to sentencing in trial court case CR2020 0193 on Counts 1 and 5, in addition to the unmerged Count 4. Armour was then sentenced to serve an indefinite minimum prison term of 8 years to a maximum of 12 years on Count 1, 36 months in prison on Count 4, and 36 months in prison on Count 5. A 1-year mandatory prison term was imposed on the firearm specification in Count 1. All of the prison terms were ordered to be served consecutively.

{¶10} With regard to trial court case CR2020 0412, the trial court determined that Counts 1 and 2 merged for the purposes of sentencing.[4] The State elected to proceed to sentencing on Count 1, in addition to the unmerged Count 3. Armour was then sentenced to serve a 6-year prison term on Count 1, and a 12 month prison term on Count 3. Those prison terms were ordered to be served

---

[3] The firearm specifications were also merged.
[4] The firearm specification was merged with the firearm specification from trial court case CR2020 0193.

consecutively, and consecutive to the prison terms in CR2020 0193.[5] Judgment entries memorializing Armour's sentence were filed January 21, 2022. It is from these judgments that Armour appeals, asserting the following assignments of error for our review.

**Assignment of Error No. 1**
**The trial court erred by allowing inadmissible hearsay after proper objection by appellant and subsequent limiting instruction failed to cure the damage caused by the testimony.**

**Assignment of Error No. 2**
**The trial court improperly allowed the prosecutor, during closing argument to offer hearsay statement[s] as substantive evidence.**

**Assignment of Error No. 3**
**Appellant's convictions were against the manifest weight of the evidence.**

{¶11} We elect to address the assignments of error out of the order in which they were raised.

*Third Assignment of Error*

{¶12} In his third assignment of error, Armour argues that his convictions were against the manifest weight of the evidence. Armour specifically challenges the determination that he was in constructive possession of the drugs and the firearm in the second-floor, east bedroom.

---

[5] Armour's aggregate prison term was summarized by the trial court as, "a mandatory 1 year term on the firearm specification * * * consecutive to a minimum of 21 years to a maximum of 25 years (14 of said 21 years is mandatory time)." (Doc. No. 137).

Standard of Review

**{¶13}** In reviewing whether a verdict was against the manifest weight of the evidence, the appellate court sits as a "thirteenth juror" and examines the conflicting testimony. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 1997-Ohio-52. In doing so, this Court must review the entire record, weigh the evidence and all of the reasonable inferences, consider the credibility of witnesses and determine whether in resolving conflicts in the evidence, the factfinder "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Id*.

**{¶14}** Nevertheless, a reviewing court must allow the trier-of-fact appropriate discretion on matters relating to the credibility of the witnesses. *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967). When applying the manifest-weight standard, "[o]nly in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Haller*, 3d Dist. Allen No. 1-11-34, 2012-Ohio-5233, ¶ 9, quoting *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, ¶ 119.

Controlling Statutes

**{¶15}** In trial court case CR2020 0193 Armour was convicted of aggravated trafficking in drugs (methamphetamine), possession of a fentanyl-compound,

having weapons while under disability, and a one-year firearm specification.[6] The statutes for which Armour was convicted read, respectively, as follows:

[aggravated trafficking in drugs]

**(A)  No person shall knowingly do any of the following:**

**\* \* \***

**(2)   Prepare for shipment, ship, transport, deliver, prepare for distribution, or distribute a controlled substance or a controlled substance analog, when the offender knows or has reasonable cause to believe that the controlled substance or a controlled substance analog is intended for sale or resale by the offender or another person.**

**\* \* \***

**(C)  Whoever violates division (A) of this section is guilty of one of the following:**

**(1)   If the drug involved in the violation is any compound, mixture, preparation, or substance included in schedule I or schedule II, \* \* \* whoever violates division (A) of this section is guilty of aggravated trafficking in drugs. The penalty for the offense shall be determined as follows:**

**\* \* \***

**(e)   If the amount of the drug involved equals or exceeds fifty times the bulk amount but is less than one hundred times the bulk amount and regardless of whether the offense was committed in the vicinity of a school or in the vicinity of a juvenile, aggravated trafficking in drugs is a felony of the first degree, and the court shall impose as a mandatory prison term a first degree felony mandatory prison term.**

---

[6] These are the convictions that remained following merger.

R.C. 2925.03(A)(2)/(C)(1)(e);

[possession of a fentanyl-related compound]

**(A) No person shall knowingly obtain, possess, or use a controlled substance or a controlled substance analog.**

\* \* \*

**(C) Whoever violates division (A) of this section is guilty of one of the following:**

\* \* \*

**(11) If the drug involved in the violation is a fentanyl-related compound \* \* \* [t]he penalty for the offense shall be determined as follows:**

\* \* \*

**(c) If the amount of the drug involved equals or exceeds fifty unit doses but is less than one hundred unit doses or equals or exceeds five grams but is less than ten grams, possession of a fentanyl-related compound is a felony of the third degree, and there is a presumption for a prison term for the offense.**

R.C. 2925.11(A)/(C)(11)(c);

[having weapons while under disability]

**(A) Unless relieved from disability under operation of law or legal process, no person shall knowingly acquire, have, carry, or use any firearm or dangerous ordnance, if any of the following apply:**

\* \* \*

**(2) The person is under indictment for or has been convicted of any felony offense of violence or has been adjudicated a delinquent child for the commission of an offense that, if**

**committed by an adult, would have been a felony offense of violence.**

R.C. 2923.13(A)(2);

[firearm specification]

**(A) Imposition of a one-year mandatory prison term upon an offender * * * is precluded unless the indictment * * specifies that the offender had a firearm on or about the offender's person or under the offender's control while committing the offense.**

R.C. 2941.141.

{¶16} Armour was convicted in trial court case CR2020 0412 of trafficking in heroin and possession of cocaine. These statutes read, respectively, as follows:

[trafficking in heroin]

**(A) No person shall knowingly do any of the following:**

**\* \* \***

**(2) Prepare for shipment, ship, transport, deliver, prepare for distribution, or distribute a controlled substance or a controlled substance analog, when the offender knows or has reasonable cause to believe that the controlled substance or a controlled substance analog is intended for sale or resale by the offender or another person.**

\* \* \*

**(C) Whoever violates division (A) of this section is guilty of one of the following:**

**\* \* \***

**(6) If the drug involved in the violation is heroin or a compound, mixture, preparation, or substance containing heroin, whoever**

**violates division (A) of this section is guilty of trafficking in heroin. The penalty for the offense shall be determined as follows:**

**\* \* \***

**(e)   Except as otherwise provided in this division, if the amount of the drug involved \* \* \* equals or exceeds ten grams but is less than fifty grams, trafficking in heroin is a felony of the second degree, and the court shall impose as a mandatory prison term a second degree felony mandatory prison term.**

R.C. 2925.03(A)(2)/(C)(6)(e);

[possession of cocaine]

**(A) No person shall knowingly obtain, possess, or use a controlled substance or a controlled substance analog.**

**\* \* \***

**(C)   Whoever violates division (A) of this section is guilty of one of the following:**

**\* \* \***

**(4)   If the drug involved in the violation is cocaine or a compound, mixture, preparation, or substance containing cocaine, whoever violates division (A) of this section is guilty of possession of cocaine. The penalty for the offense shall be determined as follows:**

**(a)   Except as otherwise provided in division (C)(4)(b), (c), (d), (e), or (f) of this section, possession of cocaine is a felony of the fifth degree, and division (B) of section 2929.13 of the Revised Code applies in determining whether to impose a prison term on the offender.**

R.C. 2925.11(A)/(C)(4)(a).

Relevant Authority

**{¶17}** Based on Armour's challenges to his convictions, the key issue to determine is whether the jury clearly lost its way in determining that Armour was in possession of the drugs and the firearm in the second-floor, east bedroom. Possession is defined in R.C. 2925.01(K) as "having control over a thing or substance, but may not be inferred solely from mere access to the thing or substance through ownership or occupation of the premises upon which the thing or substance is found."

**{¶18}** Importantly, "[p]ossession of drugs can be either actual or constructive." *State v. Bustamante*, 3d Dist. Seneca Nos. 13-12-26, 13-12-04, 2013-Ohio-4975, ¶ 25. Actual possession exists when the circumstances indicate that a person has or had an item "'within his immediate physical possession.'" *State v. Watts*, 3d Dist. Hancock No. 5-12-34, 2016-Ohio-257, ¶ 11, quoting *State v. Williams*, 4th Dist. Ross No. 03CA2736, 2004-Ohio-1130, ¶ 23. Constructive possession exists when a person was able to exercise dominion and control over an item, even though that item may not be within his immediate physical control. *Id*. Both dominion and control, and whether a person was conscious of the item's presence, may be established through circumstantial evidence. *E.g.*, *State v. Myles*, 3d Dist. Marion No. 9-19-74, 2020-Ohio-3323, ¶ 25; *see also State v. Hankerson*, 70 Ohio St.2d 87, 91 (1982).

{¶19} In fact, the prosecution can establish constructive possession of a controlled substance "by circumstantial evidence alone." *Bustamente* at ¶ 25. "'Absent a defendant's admission, the surrounding facts and circumstances, including the defendant's actions, are evidence that the trier of fact can consider in determining whether the defendant had constructive possession.'" *Id.* quoting *State v. Voll*, 3d Dist. Union No. 14-12-04, 2012-Ohio-3900, ¶ 19.

{¶20} "Although a defendant's mere proximity to drugs is in itself insufficient to establish constructive possession, proximity to the drugs may constitute some evidence of constructive possession." *State v. Brown*, 4th Dist. Athens No. 09CA3, 2009-Ohio-5390, ¶ 20. However, a defendant's presence in the vicinity of contraband, coupled with another factor or factors probative of dominion or control over the contraband, may establish constructive possession. *State v. McClain*, 3d Dist. Hancock No. 5-19-19, 2020-Ohio-1436, ¶ 46.

Evidence Presented

{¶21} A confidential informant performed controlled drug buys at 543 East Second Street in Lima on three separate dates in July 2020, with the final time being July 22, 2020. The confidential informant purchased the drugs from a man he knew as "Trig," who was identified by police as Stanford Shine. A woman named Ryanne Eversole was also with Shine when the controlled drug buys were made.

{¶22} Law enforcement obtained a search warrant for 543 East Second Street. The warrant was executed with a SWAT team on July 24, 2020, shortly after 7 a.m.[7] Upon entering the residence in question, officers located multiple children between 3 and 9 years old on the first floor along with Shine and Eversole, who were staying in a first floor bedroom. The first floor bedroom was found to contain multiple drugs, all in the amount of approximately 2 grams or less. Shine and Eversole also had personal documents in the first floor bedroom, and a firearm was also located.

{¶23} When the residence was entered by the search team, several officers immediately went upstairs, reaching the second floor landing within 15-20 seconds after entry. The upstairs of the residence had two bedrooms branching off from the landing. Armour and the mother of his children, Lexus Becker, were on the landing just outside of the second floor, east bedroom. They complied with orders to get on the ground and they did not have any weapons or drugs on them.

{¶24} The other bedroom on the second floor was blocked shut. When law enforcement entered, a teenage male and a teenage female were attempting to cover

---

[7] As will be discussed when addressing the first assignment of error, *infra*, the confidential informant told law enforcement that the "supplier" of the drugs was supposed to be at the residence in question on July 23, 2020. The confidential informant did not testify at trial, and the defense objected to the introduction of the confidential informant's statement being presented through an officer. The objection was overruled, though the trial court immediately gave a limiting instruction to the jury, indicating that the information could only be used to show why the officers were taking the next steps in their investigation—or, in this instance, as the State argued, why there was a day of delay before the execution of the search warrant.

themselves with clothes or blankets. The bedroom that the teenagers were in did not contain any drugs or weapons.

{¶25} As for the second floor, east bedroom, officers had to move around Armour and Becker to get to it. Once inside, a plastic baggie of what was determined to be 9.81 grams of a fentanyl-related compound was in plain view on the floor.[8] Numerous other things were in the room, described as "tossed haphazardly" around. (Tr. at 59). There was a firearm on the bed, along with a pair of pants and a red bag.[9] There was $1,111 in currency in the pocket of the pants, and $8,000 in currency in the red bag. The currency in the red bag was contained in one large "band," but each $1,000 was separated by another band into a smaller bundle. Notably the currency found included multiple $20 bills that had been used in the controlled buys by the confidential informant. The red bag on the bed also contained a plastic baggie with .73 grams of cocaine.

{¶26} Further search of the second floor, east bedroom, revealed a black case in the clothes hamper under some articles of clothing. Inside the black case, law enforcement found a "crystal substance" wrapped in plastic, that was determined to contain methamphetamine in the amount of 114.63 grams. A separate plastic bag containing methamphetamine in the amount of 96.38 grams was found in the black

---

[8] To prevent redundancy, we will note here that all of the drugs listed were scientifically tested and the weights are within +/- .04 grams to a reasonable degree of scientific certainty.
[9] Although Armour denied that the firearm was his, he stipulated at trial that he was under disability for a prior conviction.

-15-

case. Also located in the black case was a bag that contained 33.32 grams of heroin, and still another bag containing .83 grams of cocaine. In addition, the black case contained a box of 40 caliber ammunition. The ammunition would fit the gun found on the bed in the same room, but not the gun found downstairs.

{¶27} A few other items of note were located during the search of the second floor, east bedroom. There was a small bag or purse hanging up with Lexus Becker's ID, and $60 in currency. A separate "fanny" pack contained a digital scale. There was also an ID card for a "Kascal Coleman" on the floor.[10]

{¶28} Following the search of the residence, Armour, Shine, and Sizemore were interrogated by police. Armour told police that he had stayed in the second floor, east bedroom, the night before the execution of the warrant. He stated that the money in the room belonged to him and his girlfriend, Becker, though he acknowledged he was not gainfully employed. He claimed that Becker had received all or most of the money from the government stimulus. However, Armour denied knowing that there were drugs or weapons in the room, stating that they were not his. He did acknowledge being a drug user, stating that he used fentanyl; still, he claimed he was unaware of the bag of a fentanyl-related compound that was in plain view on the bedroom floor.

---

[10] Kascal is Armour's first name; however, this was apparently not his ID card. An officer was asked about the individual on the ID card and he said he could not recall whether he tracked down "Kascal Coleman." There was no further information presented related to the ID card.

**{¶29}** Later in the interview, Armour told officers that he was not the "big fish," but he could get law enforcement the "big fish." He also told law enforcement that they had made a mistake by "booking" him because now he could not do anything to help.

**{¶30}** As to his defense, Armour emphasized through cross-examination that the teenagers in the residence in the other upstairs bedroom were never interviewed by police. An officer testified that because no drugs were found in the room that the juveniles were in, he did not suspect them of drug activity. Regardless, Armour also emphasized that Shine and Eversole were never charged despite directly selling drugs to the confidential informant. Furthermore, Armour's attorney questioned why police did not even interview Becker. Following the search of the residence, Becker was allowed to remain with the children at the residence while awaiting children's services.

## Analysis

**{¶31}** Armour argues that the jury clearly lost its way by convicting him of the drug offenses and of possession of a firearm. He contends that he was not located in the room with the items, that he never sold drugs to the confidential informant, and that the drugs could have belonged to any number of other individuals inside, or outside, of the residence. He maintains that he was simply

found in proximity to the drugs and the gun, and that proximity was not enough for constructive possession.

{¶32} Contrary to his argument, Armour himself acknowledged during his interrogation that the money in the room was his, or at least Becker's. The record supports that the money contained multiple bills that were used in the controlled buys. Armour also acknowledged staying in the room the night before the execution of the search warrant.

{¶33} Furthermore, Armour acknowledged being a drug user, with his drug of choice being fentanyl. A fentanyl-related compound was found in plain view on the floor of the room even though Armour denied knowing anything about the drugs in the room. The jury was free to judge the credibility of this statement and find it to be disingenuous. *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967).

{¶34} While Armour attempts to suggest that he was merely one of the two closest people to the drugs, he had direct ties to the room in question, he was found just outside of it, and he claimed the money inside of it—money that was mixed with a bag of drugs. In addition to these points, Armour made the statements to the police that he was not the "big fish" but he could get the "big fish." A jury could readily interpret his statement that he was a "fish" at all as an admission that he was a player in the drug trade.

**{¶35}** In sum, as we have stated previously, presence in the vicinity of drugs coupled with other factors can establish constructive possession. *State v. McClain*, 3d Dist. Hancock No. 5-19-19, 2020-Ohio-1436, ¶ 46. The jury in this case analyzed the evidence and determined that all of the additional factors in this case, including the admissions made by Armour during his interrogation, established constructive possession. We cannot find that the jury clearly lost its way or that the convictions here constituted a manifest miscarriage of justice.[11] Therefore, Armour's third assignment of error is overruled.

### *First Assignment of Error*

**{¶36}** In his first assignment of error, Armour argues that the trial court erred by permitting inadmissible hearsay over objection. Further, he contends that the trial court's limiting instruction did not cure the damage caused by the testimony.

### Standard of Review

**{¶37}** Generally, the admission of evidence lies within the broad discretion of the trial court. *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, ¶ 62. However, we conduct a de novo review of hearsay evidentiary rulings that implicate the confrontation clause. *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, ¶ 97; *State v. Daniels*, 11th Dist. Trumbull No. 2020-T-0022, 2021-Ohio-790, citing *State v. Hartman*, 161 Ohio St.3d 214, 2020-Ohio-4440, ¶ 22.

---

[11] Armour makes no challenges to the remaining elements of the crimes against him; nevertheless, the record supports the convictions on all of the elements.

-19-

Relevant Authority

**{¶38}** "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). Consequently, a statement is, by definition, not hearsay when it is offered for a purpose other than to prove the truth of the matter asserted. *State v. Osle*, 140 Ohio St.3d 131, 2014-Ohio-2966, ¶ 118.

**{¶39}** One instance where testimony has been permitted as non-hearsay is when a police officer is offering testimony to explain "the next investigative step." *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, ¶ 186, citing *State v. Ricks*, 136 Ohio St.3d 356, 2013-Ohio-3712, ¶ 27. When the testimony is being offered to explain why an officer took the next particular step in an investigation, it falls outside of the hearsay classification because it is not being offered for the truth of the matter asserted.

**{¶40}** However, the Supreme Court of Ohio cautioned that "the well-worn phrase 'not offered for the truth of the matter asserted' is not a talismanic incantation that opens the door to everything said outside the courtroom." *Ricks* at ¶ 25, quoting *State v. Richcreek*, 196 Ohio App.3d 505, 2011-Ohio-4686, ¶ 26 (6th Dist.). Testimony offered to explain police conduct is admissible as nonhearsay *only if*, "[1] the conduct to be explained [is] relevant, equivocal, and contemporaneous with the statements; [2] the probative value of statements [is not] substantially

outweighed by the danger of unfair prejudice; and [3] the statements cannot connect the accused with the crime charged." *Ricks* at ¶ 27.

**{¶41}** It is particularly important to emphasize that careful analysis of an officer's statement explaining "the next investigative step" is required when the officer's testimony touches on statements made by another individual who is not testifying because "[t]he Sixth Amendment to the United States Constitution guarantees an accused the right to confront witnesses against him." *Crawford v. Washington*, 541 U.S. 36, 54 (2004). As a general rule, the Confrontation Clause is implicated by the admission of out-of-court statements that are testimonial in nature when the declarant does not testify in the proceeding. *See Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 309-310 (2009).

**{¶42}** However, we note that even if hearsay was erroneously admitted, we will not reverse the conviction absent a showing that Armour's substantial rights were affected. Crim. R. 52(A); *McKelton* at ¶ 190.

Analysis

**{¶43}** At trial, testimony indicated that a confidential informant conducted three controlled drug buys at 543 East Second Street in Lima, with the last purchase being on July 22, 2020. The confidential informant did not testify at trial.

{¶44} After the third controlled drug buy, law enforcement officers obtained a search warrant for the residence in question. The following testimony then occurred at trial related to the execution of the search warrant:

> **[PROSECUTOR]: Okay. Between the obtaining of the search warrant and the execution of the search warrant, was that like the same day? What happened?**
>
> **[CHIEF HAINES]: The search warrant was presented to Judge on the 22nd of July, 2020 and the service of the search warrant was not until the 24th of July, 2020. In the meantime we received additional information, source information from the informant who had purchased narcotics from the residence, that the supplier–**
>
> **[DEFENSE COUNSEL]: Objection. Hearsay.**
>
> **[PROSECUTOR]: Your Honor, I'm not offering it for the truth of the matter asserted, but as to why – and I can lay some more questions – but, as to why he did what he did in his investigation.**
>
> **[DEFENSE COUNSEL]: If he's going to say what the informant tells him that's hearsay.**
>
> **THE COURT: All right. Counsel, approach. Ladies and gentlemen of the jury, just disregard anything you might overhear**
>
> **[* * * discussion at the Bench * * *]**
>
> **THE COURT: So, what's your reason that it's not hearsay?**
>
> **[PROSECUTOR]: I think that it's not being offered to prove the truth of the matter asserted. It's merely offered to prove what he did next in his investigation. He kind of jumped into that a little bit and I was going to ask him some further questions in that regard.**

**THE COURT: Well, he got a search warrant. Can't you go from there?**

**∗ ∗ ∗**

**[PROSECUTOR]: Well, I asked him if there was time in-between and then as part of his investigation he received additional information. Again, it's just part of the investigation.**

**THE COURT: Before he got the search warrant? Is that what you're going to ask him – before he got the search warrant, or, before it was executed?**

**[PROSECUTOR]: Before it was executed.**

**THE COURT: From whom?**

**[PROSECUTOR]: From the confidential informant.**

**THE COURT: Well, you can ask him if he got information. Are you going to ask him then what the information was on? What the informant said?**

**[PROSECUTOR]: I was; yes. (inaudible)**

**THE COURT: Okay. I'll allow it. I'll overrule the objection. But, I'm not going to allow a lot of it.**

**[PROSECUTOR]: Oh, no, I'm not going to go –**

**THE COURT: I'll overrule the objection. Go ahead.**

**[trial resumes]**

**∗ ∗ ∗**

**[PROSECUTOR]: Okay. Then after the search warrant was signed, I believe I asked you if you executed it right away or if there was a time in-between getting it signed and executing it.**

**[CHIEF HAINES]: Yes, there was a day in-between. Yes.**

**[PROSECUTOR]: Okay. During that day in-between, so it was the 22nd through the 24th, is that right?**

**[CHIEF HAINES]: Yes, ma'am.**

**[PROSECUTOR]: Okay. Did you receive any information that related to your investigation?**

**[CHIEF HAINES]: There was additional information provided by the confidential informant that the supplier of the narcotics would be at 543 East Second on the 23rd.**

**[PROSECUTOR]: Okay.**

**THE COURT: Okay. I'll just tell the jurors that that testimony as to what the confidential informant told him wasn't being offered to prove that the supplier would be there, only that the information was conveyed and that explains what they went ahead and done, or, did. Okay? So, go ahead.**

(Tr. at 102-106).

**{¶45}** Armour argues on appeal that the preceding testimony regarding the "supplier" being at the residence on July 23 was inadmissible hearsay in violation of the confrontation clause. He contends that the confidential informant did not testify to have his statement challenged, and that the officer's testimony effectively implicated Armour by stating that an additional individual would be at 543 East Second Street, implying that the additional person would be the supplier of the drugs. Armour argues that this statement needed to at least be presented by the confidential informant himself, and, further, that the statement was more prejudicial

-24-

than probative. Thus Armour contends that the statement fails multiple of the *Ricks* elements outlined previously that are used to determine when "the next investigative step" is admissible as non-hearsay.

**{¶46}** The State counters by arguing that Armour was not specifically named as the "supplier" through the officer's testimony and that the officer's testimony was merely to show why the search warrant was not served for an extra day after it was obtained. The State thus concludes that the testimony here should not be inadmissible under *Ricks*.

**{¶47}** At the outset of our review, it is true, as the State suggests, that Armour was not specifically named by the officer in his testimony, which makes this case effectively different from *Ricks* where the accused was much more directly connected to the crime. Thus *Ricks* is factually distinguishable.

**{¶48}** Moreover, even if the testimony was not admissible under *Ricks*, we cannot find it materially impacted Armour's trial. First, the confidential informant's statement was elicited through this officer's testimony on other occasions that were not objected to, *including at one point by the defense*.[12] Second, the specific wording of the officer's testimony was, in some way, beneficial to defense counsel in the arguments he was making to the jury. The statement indicated that a supplier would be at the subject residence *on the 23rd*. The officer did not state that according to the

---

[12] This segment is excerpted in the next assignment of error.

confidential informant the supplier would come to the residence and stay there. Thus the statement from the officer could have supported defense counsel's argument that the supplier was actually a different person than Armour and that Armour was merely unlucky by staying in the room where the drugs were stashed. This was, in fact, a tactic employed by defense counsel. With this in mind, the prejudicial impact was already severely limited, and it was only further limited by the trial court's *immediate* instruction, which the jury was presumed to follow. *State v. Jones*, 135 Ohio St.3d 10, 2012-Ohio-5677, ¶ 194.

**{¶49}** In sum, while there was a danger here of potentially violating *Ricks* through the officer testifying regarding the confidential informant's statement to him, it does not appear there was actually a violation akin to the *Ricks* case. Moreover, even if we assumed that the testimony was erroneously admitted, we could only conclude that it was harmless beyond a reasonable doubt. Armour was found in close proximity to the money and the drugs, he acknowledged that the money belonged to him to some degree, and the money contained bills involved in the controlled drug buys. Armour also told law enforcement that he was not the "big fish" but he could get them the "big fish." Therefore on the basis of the evidence, we could only conclude that if there was an error, it was harmless beyond a reasonable doubt. *McKelton* at ¶ 190. For these reasons, Armour's first assignment of error is overruled.

*Second Assignment of Error*

**{¶50}** In Armour's second assignment of error he argues that the trial court improperly permitted the State to reference the "improper hearsay" discussed in the first assignment of error during closing arguments as though the testimony constituted substantive evidence.

Standard of Review

**{¶51}** "We review allegations of prosecutorial misconduct during closing arguments by asking 'whether the remarks were improper and, if so, whether they prejudicially affected substantial rights of the defendant.'" *State v. McAlpin*, --- Ohio St.3d ---, 2022-Ohio-1567, ¶ 156, quoting, *State v. Smith*, 14 Ohio St.3d 13, 14 (1984). Although "criminal trials cannot be squeezed dry of all feeling," *State v. Keenan*, 66 Ohio St.3d 402, 409 (1993), "excessively emotional arguments tending to inflame the jury's sensibilities" are improper. *State v. Tibbetts*, 92 Ohio St.3d 146, 168 (2001). However, "[t]he touchstone of the analysis 'is the fairness of the trial, not the culpability of the prosecutor.'" *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, ¶ 155, quoting *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940 (1982).

Analysis

**{¶52}** During closing arguments, the prosecutor summarized the evidence presented by the witnesses and made the following statement:

> There's evidence that Mr. Armour was only in that house for maybe a day, and probably not much longer than that if he was. But, what I don't want you to gloss over is Chief Haines got a tip. Drug dealers need to get drugs from somebody. He got a tip that Stanford was going to get some more drugs.
>
> [DEFENSE COUNSEL]: Objection, your Honor. That wasn't the testimony in this Courtroom.
>
> THE COURT: Sustained.
>
> [PROSECUTOR]: He got a tip that there may be a supplier coming to that house on Second Street. So, when they hit the house there's Stanford and Ryanne, who they expect to be there. Who don't they expect to be there? The defendant. They don't know it's going to be him. They don't even know if the supplier is still going to be around or not. But, guess who's there? Guess who said that he stayed in the room where all this stuff was found laying on the floor and laying on the bed? Bullets matching the gun were laying on the bed. So, reason and common sense, the State hopes, is going to lead you to find and to make an inference, we talked about circumstantial evidence, that all that stuff belongs to him.

(Tr. at 296).

{¶53} Armour contends on appeal that the prosecutor committed misconduct by treating the officer's testimony from the previous assignment of error as substantive evidence after the trial court had already provided a limiting instruction that the evidence could only be used to explain the next step of the investigation. However, contrary to Armour's argument, the statement from the confidential informant was brought up at other times during the trial, without objection, including once by the defense. During Armour's attorney's re-cross-examination of Chief Haines, the following exchange occurred:

-28-

**[DEFENSE COUNSEL]: Okay. You said you had some information that a supplier was going to be at the residence; right?**

**A.    Yes.**

**[DEFENSE COUNSEL]: You don't know whether it could have been anybody else in the residence; correct?**

**A.    Correct.**

**[DEFENSE COUNSEL]: In other words, the only surveillance you did was of Mr. Shine and Miss Eversole; correct?**

**A.    Yes.**

**[DEFENSE COUNSEL]: All right. You didn't know who else was there prior to the search warrant?**

**A.    Correct.**

**[DEFENSE COUNSEL]: Okay. It could have been Miss Becker?**

**A.    Correct.**

(Tr. at 217).

**{¶54}** The preceding segment shows that defense counsel actually used the information provided by the confidential informant to show that there was no indication as to *who* the supplier was, and that it could have been Armour's significant other who was on the landing with him during the execution of the search warrant. As defense counsel pointed out, Becker was never interviewed by police in this matter.

**{¶55}** Moreover, the preceding segment touches on the fact that the confidential informant's statement to law enforcement was that the supplier would be at the residence on July 23rd. The warrant was not served until the morning of July 24th, and police did not conduct surveillance on the residence in question prior to the execution of the warrant, thus officers could not say who had come and gone from the residence during that time period. Given that defense counsel used the evidence in a valid attempt to establish reasonable doubt as to who possessed the drugs and the firearm, we cannot find that the prosecutor's statement was improper.

**{¶56}** Nevertheless, even if we did find the statement improper, we still do not find that Armour was materially prejudiced in this matter. He was located just outside the room with the drugs, he claimed the money belonged to him and Becker, the money contained controlled-buy funds, and Armour made the statement about not being the "big fish." Given all of the evidence, even if we assumed the prosecutor's statement was improper, we do not find reversible error here. Therefore, Armour's second assignment of error is overruled.

*Conclusion*

**{¶57}** For the foregoing reasons, Armour's assignments of error are overruled and the judgments of the Allen County Common Pleas Court are affirmed.

***Judgment Affirmed***

**ZIMMERMAN, P.J. and MILLER, J., concur.**